**In re Thomas P. TYLER and Georgia L. Tyler, Kyova Corporation, and Tri-State Molded Plastics, Inc., Debtors.**

**Bankruptcy Nos. 82–00127–BKC–JAG to 82–00129–BKC–JAG.**

United States Bankruptcy Court,
S. D. Florida.

March 23, 1982.

Leib & Martinez, Coral Gables, Fla., and Peter Buhler, c/o Gunn, Venney & Buhler, Miami, Fla., for debtors.

Harry L. Durant, and Robert F. O'Malley, Jr., c/o Smathers & Thompson, Miami, Fla., for Algemene Bank, Nederland, N. V.

Steven R. Brownstein, c/o Paul, Landy, Beiley, Harper & Metsch, P. A., Miami, Fla., for Creditors' Committee and Freedom Plastics.

A. Rodger Traynor, Jr., c/o Fowler, White, Burnett, Hurley, Banick & Strickroot, P. A., Miami, Fla., for Huntington Nat. Bank.

Mark Pollack, c/o Arky, Freed, Stearns, Watson & Greer, Miami, Fla., for Royal Trust.

Emilio de la Cal, Miami, Fla., for Carib Aviation.

James B. Albers, c/o Albers & Albers, Columbus, Ohio, for Salvato & Co. Associates, Inc.

## OPINION AND ORDER ON APPLICATION FOR APPOINTMENT OF TRUSTEE OR, ALTERNATIVELY, OF EXAMINER

JOSEPH A. GASSEN, Bankruptcy Judge.

This matter came before the court upon the application of Algemene Bank Nederland N. V. (ABN) for the appointment of a trustee or, in the alternative, of an examiner in these consolidated chapter 11 cases (C.P. No. 26). The court also had before it the response of ABN to show cause why agreed orders should not continue in full force and effect etc. filed in Adversary Case No. 82–0092–BKC–JAG–A wherein Huntington National Bank and the Huntington Leasing Company were plaintiffs and the corporate debtors were defendants (C.P. No. 6 of Adversary Case No. 82–0092–BKC–JAG–A) (a copy of which the court has requested be furnished for docketing in Case No. 82–00127–BKC–JAG) and debtors' reply to ABN's application for the appointment of a trustee and its response to show cause, etc. (C.P. No. 67). The court received evidence consisting of testimony of a number of witnesses as well as numerous documents over three days, March 8, 9, and 10, 1982 and heard argument of counsel on a fourth day, March 11, 1982.

The court has considered all of the evidence before it and has read the excerpts from the various transcripts of B.R. 205 examinations as requested by the attorney for ABN as well as the authorities submitted by counsel at the final argument. No other creditor joined in ABN's application or provided any of the evidence introduced by ABN at the hearing above referred to.

ABN's application for a trustee or, alternatively, an examiner is pursuant to 11 U.S.C. § 1104. During the course of the hearing, a picture emerged of a very complex interpersonal and intercorporate structure created by the debtor Thomas Tyler, who is also the chief operating officer of the debtor-corporations and is heavily involved in the financial affairs of several subsidiary, affiliate and friendly companies.

Tyler owns 96% of the capital stock of the debtor, Kyova Corporation (KC). Tri-State Molded Plastics, Inc. (Tri-State), Kyova International (KI) and Kyova Trading (KT) are wholly-owned subsidiaries of KC. Tyler also owns 91% of a personal venture called Sigma Group Limited (Sigma) and 100% of another personal venture called C & C Partnership (C & C). Tyler also owns 50% of Transaero Dynamics. The other 50% owner is Alberto Argomaniz. An agreement has been struck with one Robert Todd, whereby Todd will become a one-third owner of Transaero and Tyler and Argomaniz will reduce their ownership to one-third each. Carib Aviation is a wholly owned subsidiary of Transaero and Carib Helicopters is a wholly owned subsidiary of Carib Aviation. Tyler has other holdings with Argomaniz and others. These consist of ventures known as Gulf Properties, Argo-Tyler Joint Venture and Miami Gulf Realty. None of these latter three are directly involved in the business ventures of the other entities previously mentioned but they did have a few relatively small transactions with those other entities during the year immediately preceding the filing of these chapter 11 cases.

Tyler appears to be a bright, articulate and energetic "deal maker" in the accepted American tradition. ABN did not establish that Tyler or any of the other agents of the debtor-corporations or the affiliated corporations were fraudulent or dishonest. ABN contends that the inclusion of loan proceeds in a financial statement under the heading of "commissions earned" is fraudulent and dishonest. The logic of doing this was adequately explained by Tyler on the basis that this provided flexibility to the various corporations in determining taxable consequences of transactions at the end of accounting periods when the tax accountants would determine the most advantageous and legally permissible way of treating these transactions. Even though this terminology (which may or may not have been ultimately erroneous) appeared on statements routinely furnished to lenders, there is no evidence that it was done for the

purpose of obtaining credit or that any lender relied on it in extending credit.

A trustee can also be appointed for incompetence or gross mismanagement by the debtor-in-possession before or after filing under § 1104(a)(1) or if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate under § 1104(a)(2).

ABN asserts that the large number of interpersonal and intercorporate transfers of funds during the past year as well as the use of the "float" resulting from cross-deposits of checks and wire transfers into two separate banks is sufficient evidence of incompetence and gross mismanagement as to require the appointment of a trustee for either of those two causes under § 1104(a)(1). In the alternative, ABN contends that the transfers and use of float constitute a sufficient showing that such an appointment is in the interests of creditors and other interests of the estate under § 1104(a)(2) because they are evidence of, at best, irresponsibility and, at worst, self-dealing which is detrimental to the interests of the corporate debtors and to the creditors of all debtors.

The debtors, on the other hand, contend that each transfer of funds from one debtor-affiliated entity to another was to provide day-to-day working capital for the transferee entity and that it was beneficial to the operation of the debtors and their affiliates. They further contend that the use of the float resulting from the cross-deposits and wire transfers was merely another unsecured line of credit which was cheaper than other available credit sources and that the use of this float was done with the knowledge and acquiescence of the two depository banks involved—Royal Trust Bank of Miami, Florida and Huntington National Bank of Columbus, Ohio (HNB). The debtors' refutation of the charge of self-dealing will be discussed below.

To detail the interpersonal and intercorporate cash transactions, would make this order unnecessarily lengthy and confusing. Suffice it to say that the unrefuted evidence is that from February 1, 1981 to January 25, 1982 (the date of the filing of the chapter 11 petitions in each of these consolidated cases) there were huge amounts of money ranging into the millions of dollars transferred back and forth among the companies. These transfers did not all precisely balance out for that period of time. There is no evidence as to what, if any, intercompany debt existed on January 31, 1981. The next corporate fiscal year would have ended January 31, 1982 and a complete audit would have been done by Price Waterhouse, a national accounting firm within a short period of time thereafter but for these proceedings. Without such beginning and ending reconciliations no assessment can be made of the effect of these transfers on intercompany debt for that period. Therefore there is no conclusive evidence at this time of actual detriment to the debtors and consequently to their creditors as a result of the cash transfers during the period in question. Furthermore, the unrefuted evidence is that there was to be a merger of the Kyova group of companies with the Transaero Dynamics companies, including especially the operating company Carib Aviation. That merger has been in the works since mid-1981 and its accomplishment at that time was frustrated only by an edict of HNB, then Kyova's primary lending creditor. Price Waterhouse had recommended the merger and was structuring it for the debtors and the merger partners. Those involved consider that the merger is merely "on hold" and all are still ready, willing and able to complete the merger. The individuals primarily involved in the merger are Tyler of the Kyova group and Argomaniz and Todd of the Transaero Dynamics-Carib Aviation companies, all of whom testified at these hearings. Upon merger, all of the corporate statements would be consolidated and the intercompany transfers would then have no net effect. The providing of short-term working capital through the technique of these intercompany advances is perfectly logical and there has been no showing that any creditor of any of the companies involved in these transfers has been prejudiced.

The analysis of the complex cash advance and repayment transactions among the various entities included those transfers back and forth between Tyler and his personal entities on the one hand and the debtor-corporations and their affiliates on the other. When analyzed collectively these latter series of transfers resulted in a net deficit to Tyler and his personal entities. Thus, he effectively received only a portion of his salary for the period reviewed. Tyler made advances to the various corporate business entities according to their working capital needs and his current ability to help meet those needs. He would then reimburse himself from "within the system" as he needed funds and such funds were available "within the system." By coincidence he had reimbursed himself $55,000 on January 19, 1982 some six days prior to filing these chapter 11 cases. However, the decision to file these cases was made subsequent to that transfer. The debtors and their affiliates considered all money interchangeable within the system to be used as and where needed.

ABN asserts that the $55,000 paid to Tyler just prior to these proceedings can be traced directly to proceeds of a loan to one of the entities for a specific purpose even though, through the movement of funds (which was constant), that amount actually came from a different entity. There was no then-immediate need to use the loan proceeds for their original purpose and there has been no showing that funds would not be made available when needed for the purpose. Therefore, the transfer of $55,000 to Tyler should not be taken out of context in reaching a conclusion. Even if it constituted a preference (which has not been shown) it would not predicate the appointment of a trustee.

Throughout the entire period, the debtors were operating their businesses in the usual manner and may not have had to seek the intervention of this court but for the steps taken by the two lending institutions, HNB and ABN. In the fall of 1981, HNB without notice, called a halt to the creation of the float through the cross-deposits and wire transfers. That float had been in excess of $2,000,000 at one time and at the time HNB terminated it, it was just slightly less than $2,000,000. Tyler, on behalf of the corporate-debtors, temporarily resolved the problem by obtaining a standby letter of credit from ABN to cover any shortfall in paying the indebtedness created by the float. ABN now contends that it did not know of that letter of credit at the time it was issued nor did it know of several other letters of credit issued by it through which the debtor-corporations were able to obtain other forms of financing. ABN contends that its officer Jan Soels, who dealt with the debtors did not follow the established procedures of ABN in creating and circulating the letters of credit issued to the debtor-corporations. Soels' employment by ABN has since terminated and it is obvious that ABN suspects some wrongdoing between Tyler and Soels although no evidence of any such wrongdoing on the part of Tyler was presented to the court at these hearings. It was ABN's action in alerting HNB and other letter of credit beneficiaries to this suspicion that resulted in HNB presenting its letter of credit for payment and precipitated the debtors' seeking the protection of this court under chapter 11 of the Bankruptcy Code in these consolidated cases.

ABN has furnished the court a number of authorities which it contends stand for the proposition that under the facts as above set forth, the court should appoint a trustee in these chapter 11 cases. The debtors are willing for the court to rely on those same authorities, contending that in those cases where a trustee was appointed, the facts are clearly distinguishable from the facts in this case. The court agrees with the debtors.

All of the authorities agree that the appointment of a trustee under § 1104 is an extraordinary remedy. Therefore, the evidence to support the appointment of a trustee must be clear and convincing. In *In re Main Line Motors, Inc.*, 9 B.R. 782 (Bkrtcy. E.D.Pa.1981), there were cash transfers exceeding $300,000 from the debtor to other corporations in which the principal of the debtor was interested. There was no consideration or any ultimate benefit to the debtors from these transactions and there-

fore the court in that case found that this conduct fell far short of any reasonable standard of business management. In the instant case, the debtors may have received more benefit than detriment from the cash transfers. Furthermore, most of the transfers were made at a time when merger of the various companies was intended and the evidence is that such a merger is still contemplated and hoped for by the companies and individuals involved. All of the transfers are recorded on the books and records of the companies involved and are easily traceable.

In *In re LaSherene, Inc.*, 3 B.R. 169, 1 C.B.C.2d 685 (Bkrtcy.N.D.Ga.1980) the debtor admitted mismanagement. Among other misconduct, the debtor had failed to remit to the government its employees' withholding taxes and had continued to pay extraordinarily high salaries and expenses for officers and other insiders. None of this applies to the instant case.

■ The existence of several related corporate entities, some of which are not included in these cases, does not, *per se*, constitute a factual predicate for the appointment of a trustee or an examiner. The appointment of an examiner should not be routinely granted. *In re 1243 20th Street, Inc.*, 6 B.R. 683, 6 B.C.D. 1190 (D.C.Cir. 1980).

ABN has not demonstrated such weakness or disloyalty on the part of management in this case as justified the appointment of a trustee in *In re Concord Coal Corporation*, 11 B.R. 552, 4 C.B.C.2d 944 (Bkrtcy.S.D.W.Va.1981). The transactions between the debtors (and their corporate and personal subsidiaries) and the Transaero and Carib companies may have been as beneficial to the debtors as to Transaero and Carib, if not more so. The transactions are not evidence of disloyalty at this time since all involved have wanted (and still want) to bring the Transaero group and the debtor group under one umbrella through merger.

The court was impressed by the candor and apparent competence of the officers of the Kyova group as well as of the Carib (Transaero) people who testified in these proceedings. Even if there is ultimately no merger of the two groups of companies, there has been no showing that Carib cannot reimburse the debtors any negative balance that exists in their cash transactions in favor of the debtors.

Likewise not controlling here is the case of *In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60, 5 C.B.C.2d 458 (Bkrtcy.E.D.Pa.1981) which was primarily a stockholders dispute. The controlling stockholder kept no books and records for the debtor and had not caused any tax returns to be filed on behalf of the debtor for several years. It was other stockholders who were primarily complaining of the controlling stockholder's conduct. Under these circumstances the bankruptcy judge in that case appointed a trustee.

■ In *In re L. S. Good & Co.*, 8 B.R. 312 (Bkrtcy.N.D.W.Va.1980), the court appointed a trustee where it concluded that the present prospects for a successful rehabilitation of the debtor were extremely remote. That conclusion cannot be reached in this case since the applicant has presented no direct evidence on that point. In *In re L. S. Good & Co.* the court restated the proposition that the bankruptcy judge must weigh the equities when considering the appointment of a trustee in a chapter 11 case and the cost effectiveness of the appointment of such a trustee. There is absolutely nothing in this record to persuade the court that rehabilitation of the debtors is more likely under the auspices of a trustee than under the direction of present management. Therefore, the expense and inconvenience of a trustee is an adverse factor which we consider in reaching our conclusion.

■ The applicant, ABN, has prayed in the alternative that an examiner be appointed under § 1104(b). Subsection (1) of (b) is similar to subsection (2) of § 1104(a). We have concluded that it does not appear to be in the interests of creditors and other interests of the estate at this time that a trustee be appointed. Nor has ABN clearly established that the fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000 as required by

§ 1104(b)(2). Therefore, we conclude that the appointment of an examiner is not mandated.

The debtors have promised that an audited report will be made by the national accounting firm of Price Waterhouse. While Price Waterhouse is not independent by reason of its having served as auditor for the debtors in the past, there is no reason to suspect that its audit will not be complete and accurate. If a question arises as to the completeness and accuracy of such audit once it has been made, then there is nothing to prevent ABN or any other party in interest from again seeking the appointment of an examiner. Certainly the merits of the various transactions have not been reached at this early juncture of the case. See *In re 1243 20th Street, Inc., supra.*

By reason of the foregoing, it is

ORDERED that the application of ABN for appointment of trustee or, alternatively, of examiner is hereby denied without prejudice to ABN or any other party in interest renewing such an application on the basis of facts not before the court and not considered at the hearings held on the application which is denied hereby.